IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THERESA SEI ROLAND, | ) | Case No. 1:22-cv-756 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Theresa Roland, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Roland claims that the structure of the Social Security Administration ("SSA") violates the principle of separation of powers, because, under 42 U.S.C. § 902(a)(3), the Commissioner does not serve at the will of the president. Roland additionally contests the Administrative Law Judge's ("ALJ") denial of benefits, arguing that the ALJ misevaluated the areas of mental functioning listing in paragraph B of Listings 12.04, 12.06, and 12.15, the opinion evidence, and her subjective symptom complaints.

Roland lacks standing to contest the constitutionality of the ALJ's decision based on the president's removal authority. And because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Roland's applications for DIB and SSI must be affirmed.

## I.      Procedural History

Roland applied for DIB and SSI on February 24, 2020.  (Tr. 177, 184).[1]  Roland alleged that she became disabled on April 15, 2018, due to: (i) major depressive disorder; (ii) post-traumatic stress disorder ("PTSD"); (iii) generalized anxiety disorder; (iv) borderline personality disorder; (v) suicide attempts; and (vi) suicidal ideation.  (Tr. 177, 184, 206).  The SSA denied Roland's application initially and upon reconsideration.  (Tr. 62–79, 82–95).  Roland requested an administrative hearing.  (Tr. 136).

On February 4, 2021, ALJ George D. Roscoe heard Roland's case telephonically and denied her applications in a February 17, 2021 decision.  (Tr. 13–26, 32–59).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Roland had the residual functional capacity ("RFC") to perform work at all exertion levels, except:

> [N]o climbing of ladders, ropes or scaffolds; no exposure to hazards (heights, machinery, commercial driving); and mental limitation that she [can only] perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation or confrontation), and no interaction with the public as a job requirement.

(Tr. 18).  On March 18, 2022, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–3).  On May 10, 2022, Roland filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.      Personal, Educational, and Vocational Evidence

Roland was born on January 20, 1987.  (Tr. 177).  She was 31 years old on the alleged onset date and 34 years old on the date of the ALJ's decision.  Roland had two years of college education, which she completed in 2013, and had specialized training as a state tested nursing

---

[1] The administrative transcript appears in ECF Doc. 6.

assistant, which she completed in 2009.  (Tr. 207).  Her past relevant work included: (i) customer service from February 2007 to January 2020; (ii) nurse assistant from October 2009 to November 2015; (iii) billing clerk from September 2013 to April 2014; and (iv) administrative clerk from May 2017 to July 2017.  (Tr. 24, 207).  The ALJ determined, however, that Roland was no longer able to perform these jobs.  (Tr. 24).

### B.    Relevant Medical Evidence

#### 1.    Hospitalizations

On October 7, 2014, Roland visited Northcoast Behavioral Healthcare's emergency department, endorsing depression, suicidal ideations, poor concentration, poor appetite and feelings of hopelessness/helplessness, and poor appetite.  (Tr. 286).  Roland's medical history up to that point included: (i) 8 hospitalizations since 2013; (ii) 2 panic attacks lasting 15-20 minutes since 2013; (iii) a suicide attempt by overdose in August 2013; (iv) psychological treatment for PTSD and associated flashbacks in April 2014; and (v) medication treatment with Lexapro, Wellbutrin, Abilify, and Zoloft.  (Tr. 286–87).  Roland was admitted and underwent psychological testing, the results of which were considered invalid because her results were indicative of exaggeration.  (Tr. 288–89).  The treatment team "felt that [Roland's] exaggeration seemed to be due to her need to have her husband recognize her illness rather than malingering." (Tr. 289).  Roland was discharged on October 9, 2014.  (Tr. 291).

On June 3, 2017, Roland visited Highland Springs Hospital for a psychosocial assessment due to worsening anxiety and depression.  (Tr. 310–11, 321).  Roland reported "not being able to function" due to her symptoms: (i) lack of concentration due to anxiety; (ii) insomnia; (iii) fatigue; (iv) daily panic attacks; and (v) feeling overwhelmed to the point of hopelessness. (Tr. 311, 314–15, 321, 323).  And Roland reported an additional suicide attempt by overdose in May 2016.  (Tr. 312).

In discussing her trauma history, Roland reported physical abuse, emotional abuse, and neglect.  (Tr. 315).  Roland reported that her adoptive parents gave her up at age seven to a therapist who, as treatment: (i) starved and then force-fed Roland pet food until she purged; (ii) locked Roland in dark rooms after forcing her to watch horror movies; and (iii) called Roland worthless and unlovable.  *Id.*  The therapist also forced Roland to admit to a sexual assault and homicidal ideation to get her into a Baptist all girl's home, where she lived from ages 10 to 18.  *Id.*  She then lived with the home's owners, who kicked her out at age 19.  *Id.*  She married and subsequently divorced after ten years.  *Id.*  And most recently, her ex-boyfriend cheated on her and stole her property.  *Id.*

In discussing her vocational history, Roland reported that she worked as a scheduler for Jewish Family Services Home Health since January 2017.  (Tr. 320).  She also reported, however, having lost several jobs due to absenteeism and underperformance.  *Id.*  On mental status examination, Roland had unremarkable results except for her mood (sad, tired and anxious), affect (sad, tearful, and constricted), and behavior (drowsy, depressed, and anxious/panicky).  (Tr. 320–21).  The attending nurse practitioner, Jessica Huffman, CNP, recommended, and Roland agreed to, partial hospitalization.  (Tr. 322, 350–51).

Roland was partially hospitalized from June 21 to June 30, 2017, when she was discharged due to work restrictions.  (Tr. 295).  Upon discharge Roland endorsed improvement in her anxiety and mood with Buspar, as well as improvement with thought process, thought content, sleep, and behavior.  *Id.*  Her mental status results were also unremarkable.  (Tr. 296).  However, Roland continued to endorse poor concentration and racing thoughts.  (Tr. 408, 411, 413, 415, 417, 419).  The attending physician noted that Roland's prognosis was "good" if she complied with treatment.  (Tr. 296).

4

On July 5, 2017, Roland requested to be readmitted and complete the partial hospitalization program.  (Tr. 406).  Roland was admitted and partially hospitalized from July 6 to July 17, 2017.  (Tr. 422, 470–72).

On July 6 and 7, 2017, Nurse Practitioner Huffman conducted new phycological and psychiatric evaluations.  (Tr. 428, 440).  Roland reported feeling overwhelmed and stressed by her job responsibilities post-discharge.  (Tr. 428).  She denied depression and reported improvement in her anxiety but stated that she was unable to leave her house from June 30 through July 4, 2017 because she obsessed about returning to work on July 5, 2017.  (Tr. 428, 476).  And Roland stated that she quit her job so she could participate in the partial hospitalization program.  (Tr. 428, 440, 476).  On mental status examination, she had unremarkable results.  (Tr. 429).

Upon discharge, Roland reported feeling "better able to manage her daily stressors and fel[t] confident to return to her daily responsibilities."  (Tr. 422).  Her mental status exam results were unremarkable.  (Tr. 423).  Nurse Practitioner Huff noted that an increase in Roland's Buspar dosage appeared "to be very effective," with improvement in her mood, affect, thought process, thought content, and behavior.  (Tr. 422).

### 2.    Counseling

In August 2017, Roland re-initiated counseling services with Kaitlyn Baker-Wlodyka, LISW.  (Tr. 557).  On September 20, 2017, Roland reported feelings of inadequacy, disappointment, and longing and difficulty staying "balanced."  (Tr. 581, 586).  Roland reported that she had been offered a position in home health care but felt ashamed of having quit (and not finding) a higher paying job.  (Tr. 586).  During a follow-up on September 27, 2017, Roland reported improved mood and excitement at being productive again.  (Tr. 592).  And in October

2017, Roland continued to report improvement.  (Tr. 597–98, 603).  Roland's mental status exam results for this period were unremarkable.  (Tr. 558, 564, 570, 576, 582, 588, 594, 600).

On January 16, 2018, Roland returned to Social Worker Baker-Wlodyka, reporting that she broke up with her boyfriend in October 2017 and was experiencing an increase in depressive symptoms: feelings of loneliness and powerlessness and occasional stress with managing her finances.  (Tr. 605, 609).  Roland also reported working full time.  (Tr. 610).  During a February 14, 2018 follow-up, she reported struggling with depression, suicidal ideations, and feelings of worthlessness.  (Tr. 611, 615).  And in March 2018, Roland reported doing "okay" and feeling "better."  (Tr. 623, 627, 629, 634).  Her mental status exam through results during this period were unremarkable.  (Tr. 606, 612, 618, 624, 630).

In April 2018, Roland reported to Social Worker Baker-Wlodyka that she was "let go" from her job because she made too many mistakes and could no longer tolerate the stress.  (Tr. 641, 645).  Roland further reported that she already interviewed for another job and was optimistic.  (Tr. 645).  Her mental status exam results were unremarkable.  (Tr. 636, 642, 647).

On May 2, 2018, Roland reported feeling positive, that she met someone online, and that she had a date scheduled for the weekend.  (Tr. 651, 656).  During a follow-up on May 16, 2018, Roland reported "doing well," that she started another job, and that she was seeing someone regularly.  (Tr. 657, 662).  On May 30, 2018, Roland reported that the person she was seeing was not interested in a serious relationship, so she decided to move forward with her own life.  (Tr. 663, 668).  Her mental status exam results for May 2018 were unremarkable.  (Tr. 652, 658, 664).

On November 12, 2018, Roland resumed counseling for symptom management support, reporting that she "has been doing well, with periods of anxiety and depression."  (Tr. 669, 674).

6

However, Roland only attended one follow-up appointment on November 19, 2018.  (Tr. 675).  Her mental status exam results for November 2018 were unremarkable.  (Tr. 670, 676).

On March 22, 2019, Roland visited Candace Searles, LPC, for counseling services.  (Tr. 682).  Roland reported that she had been doing well with her mental health over the previous two years but was concerned over how a recent death would impact her recovery.  (Tr. 686).  Roland reported that she lived with her boyfriend and a roommate, both of whom were recovering addicts.  *Id.*  Roland stated that she returned from a trip to Pittsburg to find her roommate dead of an overdose.  *Id.*  During a follow-up appointment on March 28, 2019, Roland reported struggling with her roommate's passing.  (Tr. 687, 692).  Her March 2019 mental status exam results were unremarkable.  (Tr. 682, 688).

On May 22, 2019, Roland returned to Social Worker Baker-Wlodyka, reporting that her roommate's death impacted her more than she expected.  (Tr. 693, 698).  Roland reported that she felt unsafe at home and struggled with feeling comfortable leaving her home.  (Tr. 698).  During a follow-up appointment on July 11, 2019, she reported doing "well."  (Tr. 699).  Her mental status exam results during this period were unremarkable.  (Tr. 694, 700).

On January 6, 2020, Roland presented to Premier Behavioral Health Services for a psychosocial assessment.  (Tr. 982).  Roland reported anxiety, obsessive-compulsive, and trauma-related symptoms, including: (i) restlessness; (ii) difficulty concentrating; (iii) distress in social, occupational, or other area of functioning; (iv) fear of crowds and being outside her home; (v) monthly panic attacks; and (vi) worry, racing thoughts, and catastrophic thoughts.  (Tr. 984).  Roland also reported that she had struggled to maintain a job due to anxiety, stress management, and disappointment in herself, with "some attendance issues."  *Id.*  Roland stated, however, that she had been "relatively mentally well for the past two years."  (Tr. 982).  Her mental status exam results were remarkable only for anxious/depressed mood.  (Tr. 987).  The

attending physician, Anthony McMahon, PhD, diagnosed Roland with major depressive disorder, recurrent severe without psychotic features, PTSD, and generalized anxiety disorder. (Tr. 987–88).  Roland attended one counseling session with Dr. McMahon on January 16, 2020. (Tr. 991).

On February 3, 2020, Roland returned to Social Worker Baker-Wlodyka, reporting that she returned to counseling to address ongoing depression and anxiety: (i) feelings of failure, worthlessness, and instability; (ii) persistent thoughts of suicide; and (iii) self-sabotage.  (Tr. 705, 714).  Roland also reported that, despite several attempts at employment, she "cannot keep it, due to her anxiety."  *Id.*

Through August 2020, Roland reported to Social Worker Baker-Wlodyka anxiety associated with the Covid-19 pandemic (Tr. 740, 746, 752, 763), triggers from her childhood trauma (Tr. 943), and negative self-talk (Tr. 962).  Her mental status exam results through August 2020 were unremarkable.  (Tr. 706, 712, 718, 724, 730, 736, 742, 748, 754, 760, 766, 913–14, 920–21, 932–33, 939–40, 946–47, 952–53, 958–59).

On September 1, 2020, Roland reported that she was managing "okay" and was managing her depression "better than she anticipated."  (Tr. 963, 968).  But on September 29, 2020, she reported depression, anxiety, and passive suicidal ideation.  (Tr. 993, 998).  Her mental status results were unremarkable.  (Tr. 970–71, 976–77, 994).

Roland continued to see Social Worker Baker-Wlodyka through January 2021.  (Tr. 999, 1005, 1011, 1017, 1023, 1029, 1035, 1041).  Her mental status exam results were unremarkable. (Tr. 1000, 1006, 1012, 1018, 1021, 1030, 1036, 1042).

### 3.    Psychiatry

During the time she was receiving counseling services, Roland also received psychiatric treatment from Hiu Kwan Yip, CNP, PMHNP-BC.

In July 2017, Roland reported to Nurse Practitioner Hiu Kawn that she no longer struggled with agoraphobia and that her mood and anxiety had improved with hospitalization. (Tr. 786, 791).  In August 2017, Roland reported fluctuating mood, irritability, a persistence sense of nervousness, overreaction, and stress related to her job search.  (Tr. 793, 798).  In September 2017, Roland reported that her mood was "ok" and her anxiety "in control," with no panic attacks.  (Tr. 800, 805).  And in October 2017, Roland reported that her medication treatment regimen was "beneficial," her mood was "pretty good," and her anxiety was "in control," though she had one panic attack since her last visit.  (Tr. 807, 812).  Roland's mental status exam results for 2017 were unremarkable, except for depressed mood.  (Tr. 782–83, 788–89, 795–96, 802–03, 808–09).

In January 2018, Roland returned to Nurse Practitioner Hiu Kwan, reporting a situational increase in her depression following her break-up and fleeting suicidal ideations.  (Tr. 814, 819).  Her anxiety remained "in control," without panic attacks, and she continued to work full time.  (Tr. 819).  In February 2018, Roland reported feeling overwhelmed by work and finances and continued to report depressed mood and suicidal ideations.  (Tr. 821, 826).  And although she did not have panic attacks, her anxiety was "still bad."  (Tr. 826).  In April 2018, Roland reported high anxiety due to a recent job change.  (Tr. 828, 833).  She also reported panic episodes in which she could not leave the house and fleeting suicidal ideations, though she was handling her depression better.  (Tr. 833).  In July 2018, Roland reported that her mood was "fair" and her depression "under control," but her anxiety occasionally worsened her mood and she almost had an anxiety attack the day before the visit.  (Tr. 835, 840).  In September 2018, Roland reported that propranolol (which was added in July) helped with her panic attacks, her anxiety was "overall in control," and her mood was "overall pretty good," despite fleeting suicidal ideations. (Tr. 842, 847).  But in November 2018, Roland reported that she started missing work due to

high anxiety and frequent panic attacks, so she quit.  (Tr. 849).  Roland's mental status exams for 2018 were unremarkable, except for depressed mood.  (Tr. 816–17, 823–24, 830–31, 837–38, 844–45).

On January 16, 2019, Roland visited Theresa Hovanec, APN, for a medication refill.  (Tr. 771, 773).  Her mental status exam results were unremarkable.  (Tr. 773).

In February 2019, Roland returned to Nurse Practitioner Hiu Kwan, reporting that her mood was "pretty good," she was settling into her new job, her anxiety was "in control," and she had not had a panic attack.  (Tr. 856, 861).  In June 2019, Roland reported that she stopped working because of her roommate's overdose, which worsened her depression and anxiety.  (Tr. 863, 868).  She felt, however, that she handled it much better when compared to two to three years earlier.  (Tr. 868).  And she reported that her mood and anxiety had improved, describing her mood as "pretty good" and her anxiety as "manageable."  *Id.*  In December 2019, Roland reported that she felt "pretty good" and was "doing well," though her stress level was elevated due to a new job.  (Tr. 870, 875).  Roland's mental status exam results for 2019 were unremarkable.  (Tr. 858–59, 865–66, 872–73).

On April 21, 2020, Roland had a telehealth visit with Leighanna Stephenson, APN.  (Tr. 877).  Roland reported passive suicidal ideations, though she denied depression symptoms.  (Tr. 882).  She also reported that she stopped taking her anxiety medication because of her work.  *Id.*  During a follow-up appointment in September 2020, Roland reported that her anxiety had prevented her from going out a couple of days to a week.  (Tr. 1047, 1052).  Her mental status exam results were unremarkable.  (Tr. 879–80, 1049–50).

C.      **Relevant Opinion Evidence**

1.      **Treating Source – Kaitlyn Baker-Wlodyka, LISW-S**

On January 19, 2021, Social Worker Baker-Wlodyka answered a mental impairment questionnaire regarding Roland. (Tr. 1055–06). Among other things, the questionnaire asked Social Worker Baker-Wlodyka to check boxes describing Roland's limitations in five areas of mental functioning. *Id.* The limitations were rated on a five-point scale: (i) "Unlimited or Very Good;" (ii) "Limited but satisfactory," which was undefined; (iii) "Seriously limited but not precluded" (limited to perform activity "15% of the time); (iv) "Unable to meet competitive standards" (that the claimant cannot perform the activity "independently, appropriately, effectively and on a sustained basis"); and (v) "No useful ability to function" (that the claimant cannot perform the task at all). (Tr. 1055).

As relevant to Roland's appeal, Social Worker Baker-Wlodyka checked boxes indicating that Roland was "seriously limited" in her ability to: (i) manage regular attendance and be punctual within customary tolerances; (ii) complete a normal workday/workweek without interruptions; and (iii) perform at a consistent pace without an unreasonable number of rest periods. (Tr. 1055). Social Worker Baker-Wlodyka attached to the questionnaire her answer to the questionnaire's request for clinical findings supporting her opinion:

> Ms. Roland was assessed for services here at Signature Health on 4/04/2017. At time of assessment Ms. Roland was diagnosed with Severe Depression and Anxiety. Ms. Roland was also diagnosed with [PTSD] at the time of assessment.
>
> During her time in counseling, Ms. Roland has participated in her treatment by learning ongoing coping skills for mental health. Further review of her current mental status, Ms. Roland met the criteria for Borderline Personality Disorder.
>
> Ms. Roland has reported in counseling, difficulty maintaining consistent employment. While I cannot speak to her presentation in the work environment, she does endorse difficulty maintaining sustained concentration and feeling uncomfortable in social interactions within the workforce.

Ms. Roland's prognosis is good with ongoing treatment and support with
counseling and psychiatry services.

(Tr. 1057).

### 2.    State Agency Consultants

On July 27, 2020, Cindy Matyi, PhD, reviewed Roland's mental functioning based on a

review of the medical record.  (Tr. 67–69).  Dr. Matyi determined that Roland was moderately

limited in her ability to: (i) maintain attention and concentration for extended periods; (ii) work

in coordination or in proximity with others; (iii) and complete a normal workday/workweek

without interruptions and to perform at a consistent pace without an unreasonable number and

length of rest periods.  (Tr. 68).  Dr. Matyi found Roland not significantly limited in her ability to

perform activities within a schedule, maintain regular attendance, and be punctual within

customary tolerances.  *Id.*  In a narrative explanation, Dr. Matyi stated that Roland could "carry

out simple (1-2 step) and complex/detailed (3-5 step) tasks, maintain attention, make simple

decisions, and adequately adhere to a schedule."  *Id.*  On September 24, 2020, Courtney Zeune,

PsyD, concurred with Dr. Matyi's assessment.  (Tr. 85–87).

### D.    Claimant's Function Report

On September 28, 2020, Roland submitted a function report, stating that her mental

health impairments made it difficult to get out of bed, caused panic attacks, and caused her to

lock herself inside for days.  (Tr. 232).  On good days, she could clean, dress, run errands, and

cook, but on bad days (which sometimes lasted multiple days) she would stay in bed all day.

(Tr. 233).  She had two cats that she cared for.  *Id.*

Roland reported that her mental health impairments did not affect her ability to handle

personal care.  (Tr. 233–34).  She further reported that she went outside "usually every day,"

except when her anxiety kept her inside.  (Tr. 235).  She could travel by car, go outside alone,

grocery shop once per week, and handle money.  (Tr. 235–36).  Her hobbies included reading, television, video games, and writing, but sometimes she lost interest in doing anything because of her mental health impairments.  (Tr. 236).  Her social activities included going out to eat and going for a walk once a week.  *Id.*

Roland also reported trouble with memory, concentration, and completing tasks.  (Tr. 237).  She stated that stress exacerbated her symptoms, and she did not handle change well.  (Tr. 238).  In her closing remarks, Roland stated that although she was physically capable of doing tasks, there were many days in which she lacked the mental strength to do so.  (Tr. 239).

### E.     Third-Party Function Report

On January 26, 2021, Shawn Hutson (Roland's fiancée) submitted a report on Roland's functioning.  (Tr. 278–85).  Hutson stated that Roland was affected by panic attacks, anxiety, depression, and isolation, noting that she spent most over her time indoors.  (Tr. 278–79).  Roland helped care for two cats and Hutson's daughter on alternating weekends.  (Tr. 279).  Although Roland was capable of dressing and bathing independently, she had bad days in which she exhibited "a serious lack of self-care" and either over or under eating.  *Id.*

Hutson reported that Roland was able to prepare simple meals and do household chores, albeit with encouragement.  (Tr. 280).  Roland went outside every couple of days, grocery shopped once a week, could go out by herself, and had no issues handling money.  (Tr. 281).  Roland had a friend visit once per month and had no issues getting along with others, though she "has been isolated + shut in."  (Tr. 282–83).  Hutson's report was otherwise consistent with Roland's 2020 function report.

### F.     Relevant Testimonial Evidence

Roland testified at the administrative hearing that the primary mental health issues preventing her from working were anxiety and panic attacks.  (Tr. 36).  Her symptoms were

triggered by the desire to perform effectively at work, over which she would obsess.  (Tr. 36–37).  She attempted to address the performance anxiety by working part-time as a cashier, but she still had performance anxiety despite decreased workplace demands.  (Tr. 37–38).  The cycle repeated itself over several jobs in different fields, in which she would initially excel and then fail.  (Tr. 38).  Roland testified that she could not function in a full-time work setting even with her medication and counseling therapy treatment.  (Tr. 41).

Roland testified that she had not experienced panic attack in about a month.  (Tr. 43).  Most of the time, she could feel one coming and slow it down or stop it.  *Id.*  When she was working, she experienced panic attacks three times per month, during which she would call off work or leave early.  (Tr. 42–73).  Roland testified that there were a couple of days per month that she did not get out of bed because of her mental health impairments.  (Tr. 44).  Even so, she was able to be independent taking care of herself.  (Tr. 44–45).

Roland testified that on a typical day she woke up late because of insomnia.  (Tr. 42).  If she had a therapy appointment scheduled, she would get anxious, which sometimes precluded her from leaving the house.  *Id.*  When she finished her appointment, she ran whatever errand she had to do, went home, and did laundry.  *Id.*  Once per month, maybe, she visited a friend.  *Id.*  Because of her anxiety, she didn't go out much.  *Id.*  And the anxiety associated with the administrative hearing had brought her to the verge of a panic attack in the days leading to the hearing.  *Id.*

Vocational expert ("VE") Paula Zinsmeister testified that someone with the ALJ's hypothetical limitations could perform work at the medium and light exertion levels as a cleaner, mail clerk, and living room attendant.  (Tr. 48, 54–56).  If the individual would be off task 20% of the time, the VE testified there were no jobs available the individual could perform.  (Tr. 56).

14

If the individual were absent from work, late, or left early three times per month, the VE testified that would be work preclusive. (Tr. 56–57).

## III. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"). But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS

157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.      Separation of Powers

Roland argues that a remand is warranted because the statutory structure of the SSA governing the removal of the Commissioner is identical to that of the Consumer Financial Protection Bureau ("CFPB"), which the Supreme Court held in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) (hereafter "*Seila Law*"), violated the principle of separation of powers.  ECF Doc. 8 at 7–8.  Roland argues that Andrew Saul therefore was unconstitutionally appointed and lacked the authority to carry out his functions as Commissioner, which adversely affected her proceedings because: (i) the ALJ necessarily lacked the authority to hear and decide Roland's case; and (ii) the ALJ decided her case based on policies and regulations promulgated by a commissioner who lacked authority to do so.  ECF Doc. 8 at 7–9. And Roland argues that President Biden's remarks when he terminated Saul suggested disapproval by the President of Saul's policy changes.  ECF Doc. 8 at 9–10.

The Commissioner concedes that the statutory removal provisions governing the SSA Commissioner violated the principle of separation of power but contends that the constitutional error was harmless because Roland has not met her burden under *Collins v. Yellen*, 141 S. Ct. 1761 (2021), to show that the violation caused her any actual harm.  ECF Doc. 9 at 7–13.  The Commissioner alternatively argues that the separation of powers violation was harmless based on the harmless error doctrine, the *de facto* officer doctrine, the Rule of Necessity, and prudential considerations.  ECF Doc. 9 at 13–17.

In *Seila Law*, the Supreme Court reviewed the constitutionality of the CFPB's removal structure, which limited the president's authority to remove the CFPB Director only to instances of "inefficiency, neglect of duty, or malfeasance of office."  140 S. Ct. at 2192–93; 12 U.S.C.

16

§ 5491(c)(3).  The Court held that the limitation on the president's removal authority over a federal executive branch agency's single director violated the principle of separation of powers. 140 S. Ct. at 2192, 2197, 2211.  Not long after, *Collins* applied *Seila Law* to the Federal Housing Financial Agency's ("FHFA") removal structure, which prohibited the president from removing the FHFA Director except "for cause."  *Collins*, 141 S. Ct. at 1770, 1783; 12 U.S.C. § 4512(b)(2).  A "straightforward application" of *Seila Law* led the Court to the conclusion that the restriction on the president's authority to remove the FHFA Director was also a violation of the principal of separation of powers.  141 S. Ct. at 1784.  In both cases, the Court remanded for lower courts to determine whether the unconstitutional provisions resulted in "compensable harm."  *Collins*, 141 S. Ct. at 1789; *see also Seila Law*, 140 S. Ct. at 2211.

Before we can address the merits of Roland's constitutional argument, the court has an obligation to ensure its jurisdiction.  *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Regardless of whether the parties raise or have disclaimed the issue, the court must ensure the parties have standing.  *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019). To demonstrate standing, a plaintiff must show that she has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations omitted). An "injury in fact" must be more than an abstract asserted harm and must be an "invasion of a legally protected interest" that is: (i) concrete; (ii) particularized; and (iii) actual or imminent. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 540 U.S. at 560).

The court finds that Roland has failed to establish "an injury in fact" arising from Commissioner Saul's work while he was subject to an allegedly unconstitutional removal statute. Roland primarily argues that the separation of powers violation itself establishes sufficient harm to warrant relief, because the Commissioner acted without constitutional authority, which would

invalidate regulations promulgated by the Commissioner and the authority of both the ALJ and the Appeals Council to act on her disability claim.  But that argument is foreclosed by *Collins*. 141 S. Ct. at 1788 n.23 ("[T]he unlawfulness of the removal provision does not strip the [Commissioner] of the power to undertake the other responsibilities of his office.").  And, importantly, Roland has not argued in what way these issues affected the decision in *her* claim.

Roland's only other argument for establishing an injury in fact is that the President's language in the notice terminating Saul as SSA Commissioner suggested that President Biden disapproved of his policy changes and that the President would have terminated Saul sooner but for the unconstitutional removal restriction.  For one, the statements to which Roland refers were not made by the President but by unnamed White House officials.  ECF Doc. 8 at 9 n.1 (citing https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner (last visited November 18, 2022)).  And, again, Roland has not articulated in what way the President's alleged statements made it more or less likely that her disability claim would have been approved.  *See Colbert v. Comm'r of SSA*, No. 5:20-CV-2234, 2022 U.S. Dist. LEXIS 32920, at *5 (N.D. Ohio Feb. 23, 2022) (rejecting an identical argument).

Absent some argument demonstrating a personal connection between the Commissioner's allegedly improper exercise of authority and the decision on her claim, Roland asks this court to base its jurisdiction on a generalized grievance.  This has long been insufficient to establish standing.  *See Lujan*, 504 U.S. at 560 n.1 (holding that for an injury to be "particularized" the complained of conduct must have affected the plaintiff "in a personal and individual way"); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (holding that harm which affected the plaintiff and every citizen's interest in the proper application of the Constitution and laws, and relief that did not tangibly benefit him more than other citizens was not a case or controversy).

Because Roland has not alleged a particularized injury stemming from the asserted separation of powers violation, she has failed to meet her burden to establish standing. *Va. House of Delegates*, 139 S. Ct. at 1950. And we cannot, therefore, consider the merits of her constitutional challenge to the SSA.

Notwithstanding Roland's lack of standing, her constitutional challenge would nevertheless fail on the merits. The removal provision Roland argues is unconstitutional is severable from the remainder of the SSA's governing statutes because the SSA would remain fully functional if the offending removal provision were stricken. *Fauvie v. Comm'r of Soc. Sec.*, No. 4:20-cv-2750, 2022 U.S. Dist. LEXIS 122213, at *7–8 (N.D. Ohio July 11, 2022) (collecting cases). Any constitutional infirmity in the removal statute would not render Saul's appointment invalid or, by necessity, make void the decisions of the ALJ and the Appeals Council. *Id.* at *8–9. Courts have routinely rejected the argument that the ALJ or Appeals Council acted without authority because the offending removal statute deprived Saul of authority to delegate. *Id.* at *10 (collecting cases). And, for the same reasons Roland has not established standing, Roland also has not shown "a link between the removal provision and [her] case" such that the harm is "particularized to [her]" in order to establish compensable harm. *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022); *see also Calcutt v. Fed. Deposit Ins. Corp.*, No. 20-4303, 2022 U.S. App. LEXIS 15979, at *41–42, 44 (6th Cir. June 10, 2022) (unreported).

"[C]ourts across the country have uniformly concluded that the allegedly unconstitutional nature of § 902(a)(3) does not require a remand." *Fauvie*, No. 4:20-cv-2750, 2022 U.S. Dist. LEXIS 122213, at *11 (quoting *Bryan L. v. Comm'r of Soc. Sec.*, No. 2:21-cv-2835, 2022 U.S. Dist. LEXIS 31392, at *19 (S.D. Ohio Feb. 23, 2022)). Roland has not pointed to any authority holding otherwise. Nor has she established a basis for why her case should be the exception. Thus, the court finds no basis to remand on account of Roland's constitutional challenge.

### C.       Step Three- Listings 12.04, 12.06, 12.15

Roland argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in his Step Three evaluation of the paragraph B criteria of Listings 12.04, 12.06, 12.15 when the ALJ stated that Roland "reported some improvement with her mental health symptoms," which conflicted with her subjective statements to providers in 2021. ECF Doc. 8 at 16 (citing (Tr. 1040, 1046)). She further argues that the record supported a greater degree of limitation in her ability to interact with others and adapt or manage herself than what the ALJ found. ECF Doc. 8 at 17. The Commissioner did not address these issues. *See generally* ECF Doc. 9.

At Step Three of the sequential evaluation process, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing."). In evaluating whether a claimant meets or medically equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).

Listings 12.04, 12.06, 12.15 establish the automatic-disability criteria for depression, anxiety, anxiety and obsessive-compulsive disorders, and trauma- and stressor-related disorders.

20

20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.04, 12.06, 12.15.  To meet these Listings, the claimant

must show that she meets the functional limitations criteria in paragraph B.[2]  To meet paragraph

B, the claimant must show that a mental health condition resulted in an extreme limitation in one,

or marked limitations in two, of the following areas of mental functioning: (i) understand,

remember or apply information; (ii) interact with others; (iii) concentrate, persist or maintain

pace; and (4) adapt or manage oneself.  *Id.* §§ 12.04B, 12.06B, 12.15B.

The severity of a limitation is measured on a five-point scale that evaluates the claimant's

ability to function in one of the above areas independently, appropriately, effectively, and on a

sustained basis.  *Id.* § 12.00F2.  The five rating points are: (i) no limitation; (ii) mild limitation

(slightly limited functioning); (iii) moderate limitation (fair functioning); (iv) marked limitation

(seriously limited functioning); and (v) extreme limitation (no ability to function).  *Id.*  The

existence of only moderate or mild limitations will not meet the paragraph B standard.

The ALJ applied proper legal standards and reached a decision supported by substantial

evidence in concluding that Roland's mental impairments did not meet or equal Listings 12.04,

12.06, and 12.15.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  In analyzing each of the areas of

mental functioning, the ALJ reasoned:

> In understanding, remembering or applying information, [Roland] has a mild
> limitation.  [Roland] reported difficulty with memory and following instructions.
> (6E).  However, [Roland] also reported being able to drive a car, pay bills, handle
> a savings account, use checkbook/money orders, and count change, as well as
> prepare meals when feeling well or not experiencing anxiety.  (6E, 1-8).  She also
> reported playing video games, reading, watching movie[s], and crafting.  (9F, 6).
> Records reflect intact recent and remote memory and linear, logical, and/or goal-
> directed thought process.  (4F, 227-229, 284-290, 312-18, 326-339; 10F, 55-61).

---

[2] A claimant could alternatively meet Listings 12.04, 12.06, and 12.15 by satisfying the criteria in
paragraph C.  However, because Roland has not challenged the ALJ's paragraph C finding, it is forfeited.
20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.00A2, 12.04, 12.06, 12.15; *Walp v. Saul*, No. 4:18cv897, 2019
U.S. Dist. LEXIS 137407, at *8 n.4 (N.D. Ohio August 14, 2019); *see generally* ECF Doc. 8; ECF Doc.
10.

Therefore, the evidence supports a finding that [Roland] has no more than a mild limitation in this area.

In interacting with others, [Roland] has a moderate limitation.  [Roland] reported difficulty with self-esteem and boundaries and she testified to worrying about what others thought of her and isolating.  (6E; 4F; 10F).  In treatment records, she made fair or appropriate eye contact and she was cooperative, pleasant, and/or engaging.  (4F, 227-229, 284-290, 312-318, 326-339; 10F, 55-61).  She reported being in a romantic relationship and that the quality of her relationship was good.  (6E, 3; 9F, 5).  Therefore, the evidence supports a finding that [Roland] has no more than a moderate limitation in this area.

With regard to concentrating, persisting or maintaining pace, [Roland] has a moderate limitation.  [Roland] reported difficulty with concentration and completing tasks, but she felt that she could pay attention for a normal amount and drive, as well as read, watch television, and play video games when having the interest.  (6E, 5-6).  Records reflect attentiveness, fair concentration or fair attention and concentration, and/or no distractibility.  (4F, 227-229, 284-290, 312-318, 326-339; 10F, 55-61).  Therefore, the evidence supports a finding that [Roland] has no more than a moderate limitation in this area.

As for adapting or managing oneself, [Roland] has experienced a moderate limitation.  She reported difficulty with handling stress and changes in routine, as well as passive suicidal ideation, depression, anxiety, and panic attacks.  (6E; 4F; 10F).  She testified that she was unable to work due to anxiety and putting pressure on herself to perform.  She also testified that she had a couple of days per month that she did not want to go out of bed.  At times, [Roland] exhibited a depressed or anxious/depressed mood and affect.  (4F, 284-311; 9F, 6).  However, at other times, she exhibited a euthymic mood with a mood-congruent and full-range affect or a normal mood with congruent affect, fair or proper hygiene and grooming, fair insight, fair judgment, and/or no suicidal ideation.  (4F, 227-229, 284-290, 312-318, 326-339; 10F, 55-61).  [Roland] reported some improvement with her mental health symptoms with treatment including handling a stressful situation better than two to three years prior.  (4F, 101, 118, 130, 143-148, 160, 166, 208, 294-304, 312-332; 8F, 21, 71, 83).  Therefore, the evidence supports a finding that [Roland] has no more than a moderate limitation in this area.

(Tr. 16-17).  The ALJ's analysis of the paragraph B criteria complied with the regulations by actually evaluating the evidence, comparing the limitations supported by that evidence with areas of mental functioning listed in paragraph B, and explaining the basis for his findings.  *Reynolds*, 424 F. App'x at 416.

22

Roland faults the ALJ's analysis of the ability to adapt or manage herself because her 2021 treatment notes contradicted the notion that she was improving.  ECF Doc. 8 at 16.  Roland mischaracterizes the ALJ's finding.  The ALJ did not find that she was improving, only that she reported *some* improvement over the course of three years of treatment.  (Tr. 17).  When viewed in context with Roland's entire treatment history, that was not an unreasonable finding. *Compare* (Tr. 311, 314–15, 320–21, 323, 408, 411, 143, 415, 417, 419, 428, 479–529, 527–39, 609, 615, 641, 819, 833), *with* (Tr. 674, 686, 699, 716, 722, 752, 840, 847, 861, 868, 875, 918, 968, 980).  And, importantly, that was one among several reasons the ALJ gave to support his conclusion that Roland was only moderately limited in her ability to adapt or manage herself, all of which were supported by substantial evidence and could reasonably support the ALJ's conclusion.  *See* (Tr. 17).

Roland otherwise argues that the evidence supported a finding of "marked" limitations in her ability to interact with others and adapt or manage herself.  ECF Doc. 8 at 17.  But on judicial review our task isn't to determine whether the evidence establishes the severity requirement for paragraph B, but whether the ALJ's analysis was consistent with the regulations and whether his reasons for reaching the opposite conclusion were supported by substantial evidence.  42 U.S.C. § 405(g).  Here, they were.  And Roland has not otherwise attempted to challenge the ALJ's reasons for so concluding.  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).  So even though Roland pointed to evidence in her brief she contends would have warranted greater limitations, that is not enough to warrant overturning the ALJ's decision. *O'Brien*, 419 F. App'x at 416; *see* ECF Doc. 8 at 14–16.

Moreover, because Roland has not challenged the ALJ's findings regarding the other three paragraph B functional limitation categories, and because an ALJ finding that Roland had "marked" limitations in her ability to adapt or manage herself – a single category – would not

support a disability finding under the Paragraph B analysis[3], any alleged error by the ALJ in his evaluation of Roland's ability to adapt and manage herself would necessarily be harmless.

### D.     Step Four – Opinion Evidence

Roland argues that the ALJ failed to apply proper legal standards in his evaluation of Social Worker Baker-Wlodyka's opinion when he failed to adopt or explain why he did not adopt Social Worker Baker-Wlodyka's opinion on Roland's concentration and persistence limitations.  ECF Doc. 8 at 10–14.  The Commissioner responds that those limitations were tantamount to an opinion on the issue of disability and, therefore, improperly expressed an opinion on an issue reserved to the Commissioner.  ECF Doc. 9 at 20–21.  And in her reply brief, Roland distinguishes her case from those argued by the Commissioner and asserts that the Commissioner's argument is an improper after-the-fact rationalization for the ALJ's decision. ECF Doc. 10 at 2.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all he medical and other evidence in the record.  20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).  And when an ALJ finds persuasive some parts of a medical opinion and not others, he must explain why the parts of the opinion which conflict with his RFC findings were not adopted.  *See Davis v. Comm'r of Soc. Sec.*, No. 5:20-cv-2807, 2021 U.S. Dist. LEXIS 244915, at *29 (N.D. Ohio Nov. 24, 2021) (citing SSR 96-8p, 1996 SSR LEXIS 6 at *7 (July 2, 1996)).

---

[3] *See* p. 21 above.

Initially, the court is not persuaded by the Commissioner's argument that an opinion on absenteeism intrudes into a matter reserved for the Commissioner.  The Commissioner's position is understandable; such opinions sometimes "come close to stating an ultimate opinion about the existence of a disability."  *Sharp v. Barnhart*, 152 F. App'x 503, 509 (6th Cir. 2005).  But the Sixth Circuit has rejected the broad assertion that "the issue of disability based upon frequent absenteeism … remains an issue reserved to the Commissioner."  *Id.*  Courts within this Circuit have rejected similar arguments.  *E.g.*, *Alexander v. Saul*, No. 1:20-cv-00116, 2021 U.S. Dist. LEXIS 109914, at *12–13 (W.D. Ky. June 11, 2021); *Palmore v. Comm'r of Soc. Sec.*, No. 1:20-cv-36, 2021 U.S. Dist. LEXIS 59167, at *25 (S.D. Ohio Mar. 29, 2021); *Harry v. Comm'r of Soc. Sec.*, No. 19-13245, 2020 U.S. Dist. LEXIS 250746, at *21 n.5 (E.D. Mich. Dec. 21, 2020); *Avery v. Comm'r of Soc. Sec.*, No. 1:19-cv-1963, 2020 U.S. Dist. LEXIS 84878, at *30-31 (N.D. Ohio May 14, 2020).  And the caselaw the Commissioner marshals to support the argument does not stand for the general proposition that opinions on absenteeism can be disregarded without explanation.  ECF Doc. 9 at 20.[4]

Nevertheless, the court finds that Roland has not established a basis for remand on account of the ALJ's evaluation of the opinion evidence.  The crux of Roland's argument is that the RFC is inconsistent with Social Worker Baker-Wlodyka's opinion that Roland was seriously

---

[4] *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) (stating that a medical source's "implied opinion that plaintiff was unable to work is tantamount to a disability opinion, a matter reserved to the Commissioner for determination."); *Chhay v. Colvin*, No. 1:13-cv-02229, 2014 U.S. Dist. LEXIS 131441, at *15–20 (N.D. Ohio Sept. 17, 2014) (expressing skepticism that an opinion that the claimant would miss four or more days of work per month constitutes a medical opinion but, in light of conflicting precedent on the issue, nevertheless determining that the ALJ provided "good reasons" for rejecting it); *Littleton v. Comm'r of Soc. Sec.*, No. 5:12-cv-02756, 2013 U.S. Dist. LEXIS 164311, at *22–23 (N.D. Sept. 16, 2013) (stating that an opinion that the claimant would miss three or more days was not a "medical opinion" for which an ALJ needed to provide "good reasons" under the treating physical rule before rejecting it, but that the ALJ had to nevertheless "explain why such an opinion has not been followed"); *Saulic v. Colvin*, No. 5:12CV2753, 2013 U.S. Dist. LEXIS 131960, at *29–30 (N.D. Ohio Sept. 16, 2013) (same as *Littleton*).

25

limited in her ability: (i) to manage regular attendance and be punctual within customary

tolerances; (ii) complete a normal workday/workweek without interruptions; and (iii) perform at

a consistent pace without an unreasonable number and length of rest periods.  (Tr. 1055).  The

ALJ acknowledged Social Worker Baker-Wlodyka's opinion on these limitations and found

them to be *consistent* with the state agency consultant's opinion and his RFC findings.  (Tr. 22).

A comparison between the ALJ's RFC and Social Worker Baker-Wlodyka's opinion confirms

that to be the case.  The ALJ's RFC finding that Roland "perform routine tasks in a low stress

environment (no fast pace, strict quotas or frequent duty changes)" was consistent with Social

Worker Baker-Wlodyka's opinion on Roland's concentration and persistence limitations.

*Compare* (Tr. 18), *with* (Tr. 1055); *see also Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737,

2019 U.S. Dist. LEXIS 155131, at *24 (N.D. Ohio Sept. 11, 2019) (holding that the ALJ's RFC

finding restricting the claimant to simple, routine, and repetitive tasks, but not at a production

rate pace, reasonably accommodated the treating source's opinion that the claimant was

"seriously limited but not precluded" in his ability to complete a normal workday/workweek and

perform at a consistent pace).

Because ALJ's RFC findings reasonably accommodated Social Worker Baker-Wlodyka's

opinion on Roland's concentration and persistence limitations, Roland's challenge to the ALJ's

evaluation of the opinion evidence lacks merit.  *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x

543, 551 (6th Cir. 2010) (stating that procedural error in the ALJ's treatment of the opinion

evidence can be harmless if the ALJ makes finding consistent with the opinion).

E.     **Step Four - RFC**

Roland argues that the ALJ failed to apply proper legal standards in his evaluation of her

subjective symptom complaints.  ECF Doc. 8 at 17–18.  Roland argues that the ALJ's analysis

failed to account for the "variability" in her symptoms.  ECF Doc. 8 at 17 (citing *Keyse v. Saul*,

No. 1:19-CV-2495, 2021 U.S. Dist. LEXIS 61825, at *58–59 (N.D. Ohio Mar. 31, 2021)).  And

she argues that the ALJ over-relied on her ability to perform activities of daily living to conclude

that she wasn't disabled, without consideration of the totality of the evidence.  ECF Doc. 8 at 18

(citing *Aubin v. Comm'r of Soc. Sec.*, No. 1:20-CV-02206, 2022 U.S. Dist. LEXIS 8040, at *35–

38 (N.D. Ohio Jan. 14, 2022); *Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp.3d 829, 838 (S.D.

Ohio 2015)).  The Commissioner disagrees, arguing that the ALJ specifically accounted for the

"waxing and waning" of Roland's symptoms when he noted that her symptoms worsened when

she failed to apply coping skills from therapy.  ECF Doc. 9 at 17–22.

As stated above, at Step Four of the sequential evaluation process, the ALJ must

determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R.

§ 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her

impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R.

§ 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the

[ALJ] must consider limitations and restrictions imposed by all of an individual's impairments,

even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a

claimant's medical history, medical signs, laboratory findings, and statements about how the

symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS

5.

A claimant's subjective symptom complaints may support a disability finding only when

objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v.

Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a

claimant's subjective symptom complaints and may properly discount the claimant's testimony

about her symptoms when it is inconsistent with objective medical and other evidence.  *See

Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016).  In

evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4, at *15; 20 C.F.R. § 404.1529(c)(3).

If an ALJ discounts or rejects a claimant's subjective complaints, he must clearly state his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  But the ALJ need not explicitly discuss each of the regulatory factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).  And although the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010).

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in his evaluation of Roland's subjective symptom complaints.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by: (i) assessing Roland's RFC in light of the medical evidence, her testimony, and other evidence in the record; and (ii) clearly explaining that he rejected Roland's subjective symptom complaints because her statements regarding the intensity, persistence, and limiting effects of her symptoms were not consistent with the objective evidence.  20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3-4, 11-12, 15; SSR 96-8p, 1996 SSR LEXIS 5, at *13-15; (Tr. 18-24).  And the ALJ provided sufficiently clear reasons for rejecting Roland's subjective symptom complaints when he stated that:

[Roland] underwent treatment, which included psychotropic medication and counseling, to control the symptoms of her severe mental impairments. (4F; 8F; 9F; 10F). Records reflect a hospitalization in October 2014 and partial hospitalizations in June 2017 and July 2017 prior to the alleged onset date. (1F; 2F). In records regarding [Roland's] October 2014 hospitalization, she underwent testing of the Minnesota Multiphasic Personality Inventory-2 (MMPI-2). The profile was invalid due to exaggeration (over reporting), if not malingering. The psychologist concluded that in responding to the test, [Roland] appeared to exaggerate her psychiatric difficulties. They noted that the extent and severity of her reported psychological problems appeared inconsistent with her observed functioning and known history. (1F). Reported symptoms included anxiety, panic attacks, post-traumatic stress, depression, past trauma and abuse, self-consciousness, worrying about [what] others thought, suicidal thoughts or passive suicidal ideation, isolation, and difficulty with boundaries, handling stress, pressure, and changes in routine, memory, completing concentration, and following instructions. (6E; 4F; 10F). Significant mental status findings include a depressed mood or an anxious/depressed mood and affect. (4F, 284-311; 9F, 6). Records note that [Roland] reported smoking marijuana daily. (4F, 333-339). However, other significant mental findings include a euthymic mood with a mood-congruent and full-range affect or a normal mood with congruent affect, spontaneous speech, fair or proper hygiene and grooming, fair or appropriate eye contact, cooperativeness, calmness, attentiveness, fair concentration, or fair attention and concentration, no distractibility, oriented, linear, logical, and/or goal-directed thought process, intact recent and remote memory, fair insight, fair judgment, and no suicidal ideation. (4F, 227-229, 284-290, 312-318, 326-339; 10F, 55-61). The record reflects that [Roland] demonstrated worsening of symptoms at times when she failed to apply the coping skills she had learned from therapy; however, with counseling and psychiatric visits being made consistently … she had shown improvement in the area of adapting and managing oneself. (4F, 124-130, 143-148, 160-166, 227-229, 305-311, 284-290, 319-325). Further, [Roland] reported some improvement with her mental health symptoms with treatment. (4F, 101, 118, 130, 143-43, 160, 166, 208, 294-304, 312-332; 8F, 21, 71, 83). [Roland] testified that she was pretty independent with household chores and taking medication.

(Tr. 21-22).

Neither of Roland's arguments establishes a basis for vacating the ALJ's decision. The sole authority upon which Roland relies to make her variability argument is inapposite. *Keyse* determined that the ALJ in that case erred in his evaluation of a treating source opinion because, among other things, the ALJ failed to consider the treating source's opinion in light of two previous opinions by that same source. No. 1:19-CV-02495, 2021 U.S. Dist. LEXIS 61825, at

*58–59.  Because the ALJ considered the treating source's most recent opinion in isolation, *Keyse* found that the "ALJ did not consider the entire record regarding the waxing and waning of Plaintiff's symptoms."  *Id.* at *59.  That is not the case here, given there is only one treating source opinion in the record.  And a commonsense reading of the ALJ's analysis of Roland's subjective symptom complaints, in conjunction with the ALJ's discussion of the medical evidence, indicates that the ALJ considered the variability in her symptoms.

Contrary to Roland's other argument, the ALJ did not find that her "ability to perform some activities meant that she was not disabled."  ECF Doc. 8 at 18.  The ALJ mentioned Roland's ability to perform household chores and manage her medication as one among several reasons to support his finding that her subjective symptom complaints were inconsistent with the evidence.  *See Sellards v. Comm'r of Soc. Sec.*, No. 1:21-cv-1567, 2022 U.S. Dist. LEXIS 102781, at *28–29 (N.D. Ohio June 8, 2022).  The ALJ could, consistent with the regulations, consider it as part of his analysis.  20 C.F.R. 404.1529(c)(3); SSR 16-3p, 2016 SSR LEXIS 4, at *18.  And the ALJ's finding that Roland was "pretty independent" with her activities of daily living was supported by substantial evidence.  (Tr. 44 ("Pretty independent")); *see also* (Tr. 233–36, 279–82).

Because the ALJ applied proper legal standards and his conclusions were reasonably drawn from the record, the ALJ's evaluation of Roland's subjective complaints, and ultimate RFC assessments fell within the Commissioner's "zone of choice" and cannot be disturbed by this court.  *Mullen*, 800 F.2d at 545.

**IV.      Conclusion**

Because the ALJ applied proper legal standards and reached a decision supported by

substantial evidence, the Commissioner's final decision denying Roland's applications for DIB

and SSI is affirmed.

**IT IS SO ORDERED.**

Dated: November 18, 2022

Thomas M. Parker
United States Magistrate Judge

31